UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MY LOAN NGUYEN,

           Petitioner,

    v.

MICHAEL PALLARES, Acting Warden,

           Respondent.

Case No. C 19-2952 WHA (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; AND GRANTING CERTIFICATE OF APPEALABILITY AS TO *MIRANDA* VIOLATION AND INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS**

## INTRODUCTION

This is a federal habeas corpus action filed by a state prisoner pursuant to 28 U.S.C. § 2254.[1]  Respondent was ordered to show cause why the petition should not be granted. Respondent filed an answer denying petitioner's claims.  Petitioner filed a traverse.  For the reasons stated below, the petition is **DENIED.**

## STATEMENT

**A.  PROCEDURAL BACKGROUND**

In 2014, a Santa Clara County jury convicted petitioner of attempted premeditated murder (count 1) and two counts of discharging a firearm from a vehicle at a nonoccupant (counts 2 & 3). The jury found true the allegation on count 1 that petitioner personally discharged a firearm, but it found not true the allegation that petitioner caused great bodily injury to the victim.  Regarding count 2, the jury found not true the allegation that petitioner caused great bodily injury.  At a subsequent court trial in June 2014, the Santa Clara County Superior Court found not true the allegation that petitioner had served a prior prison term.

---

[1] Michael Pallares, the current acting warden of the prison where petitioner is incarcerated, has been substituted as respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

On January 30, 2015, the trial court sentenced petitioner to life in prison with the possibility of parole on count 1, plus a consecutive twenty-year term for the firearm enhancement. The trial court stayed the sentence on count 3 and ran the sentence of a midterm of five years for count 2 concurrently with the executed sentences.

On appeal, the California Court of Appeal affirmed the judgment.  On September 14, 2016, the California Supreme Court denied review.

On May 8, 2017, petitioner filed state habeas petition in the Santa Clara County Superior Court.  On May 3, 2018, the state superior court denied the petition in a reasoned decision.

On May 25, 2018, petitioner filed a state habeas petition in the California Court of Appeal. On September 17, 2018, the state appellate court denied the petition.

On November  15, 2018, petitioner filed a state habeas petition in the California Supreme Court.  On April 17, 2019, the state supreme court denied the petition.

On May 29, 2019, petitioner filed her federal petition under 28 U.S.C. 2254, in which she raises four claims: (1) her statements to police were introduced in evidence in violation of *Miranda*[2]; (2) police failed to preserve potentially exculpatory evidence and the trial court erred in denying her motion seeking dismissal of the case on this ground, filed pursuant to *California v. Trombetta*, 467 U.S. 479 (1984) and *Arizona v. Youngblood*, 488 U.S. 51 (1988) (hereinafter "*Trombetta/Youngblood* motion"); (3) her sentence is cruel and unusual in violation of the Eighth Amendment; and (4) an ineffective assistance of counsel ("IAC") claim during the course of plea negotiations.  Petitioner raised her *Miranda* violation claim on direct review, and she raised the remaining claims on collateral review.

On June 28, 2019, the court ordered respondent to show cause why the petition should not be granted.  On September 26, 2019, respondent answered.  On October 21, 2019, petitioner filed her traverse.

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

2

**B.    FACTUAL BACKGROUND**

The following description of the evidence presented at trial has been taken in part from the opinion of the California Court of Appeal (Resp. Exh. E at 2)[3] and from the trial court record.

*Prosecution Evidence*

In 2012, the victim, Tracy Pham, lived with her boyfriend, Tri Nguyen,[4] and her three children in San Jose.  Vol. 4, Reporter's Transcript ("4RT") 423-424.  In 2005, Pham split up with Hai Huynh, the father of two of Pham's oldest children, but they continued to remain in contact about their kids, sometimes through his parents.  4RT 423-424, 431.

Pham had been friends with petitioner for about ten years.  4RT 425, 460, 463.  Petitioner was Tri's cousin, and he had known her all his life.  4RT 566.  Sometime in early 2012, Pham introduced petitioner to Huynh, and they began to date.  4RT 427-428, 462, 464.

According to the state court opinion, the evidence at trial reflected that during the early morning of October 25, 2012, the date of the incident, Pham was waiting outside of a store to meet petitioner.  Pham was with Tri, and Huynh was nearby.  Petitioner and Pham had earlier exchanged angry words on the phone before deciding to meet.  Petitioner arrived at the Pham's location as a passenger in a vehicle.  As Pham and Tri approached the vehicle, petitioner fired a gun from the vehicle.  The driver and petitioner then drove off.  The police were dispatched to the scene, and petitioner was apprehended shortly thereafter.  Petitioner was interviewed in the back of the police car and later at the police station.[5]

San Jose Police Officer Santiago, who was responsible for apprehending petitioner during a "high-risk vehicle stop," testified that upon making the stop he noticed an unspent 9-millimeter bullet in plain view on the front passenger seat.  4RT 591, 594.  Officer Santiago also noticed a

---

[3] The California Court of Appeal's summary of the facts of petitioner's offense is presumed correct.  *See Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. 2254(e)(1).

[4] The court will use Tri's first name because he shares a common name with petitioner.

[5] Petitioner also wrote a letter of apology at the suggestion of the police during the second police interview.  4RT 613-616.

spent shell casing on the exterior of the vehicle on the left side of the windshield.  4RT 595.  The office found no gun in the car.  4RT 594.  Officer Santiago took petitioner into custody and placed bags over her hands to preserve possible gunshot residue.  4RT 594, 596-97.  Subsequently, the samples from petitioner's left and right hands were tested and laboratory analysis detected the presence of gunshot residue on both hands.  4RT 627, 704-706.

Pham was treated in the emergency room of Valley Medical Center for multiple gunshot wounds caused by bullet fragments.  4RT 579; 5RT 782-783, 817-822.

San Jose Police Officer Chris Heinrich was dispatched to Valley Medical Center to contact Pham.  4RT 578-579.  Pham was being treated for multiple lacerations in her thigh and buttocks.  4RT 579.  Officer Heinrich interviewed Pham, and he did not recall that she appeared to be impaired by alcohol.  4RT 580-82.  Officer Heinrich's report contained nothing to indicate she was intoxicated, and he likely would have noted such if she had been.  4RT 582-84.

Pham was advised to stay at the hospital for an additional day, but she decided to return home to take care of her children.  4RT 452-53.  Pham was in pain and unable to walk when she left the hospital.  4RT 454.  She was prescribed painkillers.  4RT 454.  Pham was able to return to work as a waitress within two weeks, but at the time of trial, she continued to feel pain in her leg.  4RT 455-56.  She had a "bullet hole" scar in her leg.  4RT 457.

*Defense Evidence*

A forensic firearm expert testified that the bullet fragments which lodged in Pham's thigh must have struck some intervening object before hitting her.  5RT 776, 782.  Based on the Pham's medical records the entry wound had a diameter of one centimeter and the fragments were subcutaneous indicating the "penetration was very, very shallow . . . .  There were two fragments, and they were barely under the skin."  5RT 782.  There were no corresponding exit wounds.  5RT 783.  The penetrative effect of the bullet or fragments was "almost zero."  5RT 790.  Based on these factors, the expert opined the bullet "definitely hit an intervening object first."  5RT 782.

The defense also presented the expert testimony of an emergency room physician that

4

Pham's wounds were superficial, "just below the skin." 5RT 823; *see also* 5RT 813-23. The emergency treatment was "nonsurgical," and the bullet fragments were not removed from the victim's thigh. 5RT 817-19, 822. The medical report indicated the entrance wound to the thigh was 1.0 by 0.5 centimeters and surrounded by three abrasions, but no exit wound existed. 5RT 818. There was no significant bleeding associated with that wound. 5RT 818. When Pham was released from the hospital, her pain level was rated a "0" on a scale of 0 to 10. 5RT 819.

Finally, the defense presented expert testimony of a forensic toxicologist that toxicology testing of Pham's blood indicated she would have had a blood-alcohol level of .202 at 2:20 a.m. on October 25, 2012. 5RT 842-845. The expert opined that at this level, she would be "impaired with respect to driving" and there was a "high likelihood that [she] would appear evidently drunk." 5RT 845.

## ANALYSIS

### A. STANDARD OF REVIEW

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. 2254(a). The petition may not be granted with respect to any claim adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000).

5

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id*. at 409.

The second prong of section 2254 applies to decisions based on factual determinations. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Id*.; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).  Where the state court's factual findings are at issue in a habeas proceeding, the district court must first conduct an "intrinsic review" of its fact-finding process.  *See Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004), *abrogated on other grounds*, *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014).  "[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340; *see also Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam) (it is not the province of the district court on federal habeas review to reassess issues of credibility or to reweigh the evidence).  "Once the state court's fact-finding process survives this intrinsic review . . . the state court's findings are dressed in a presumption of correctness. . . ." *Taylor*, 366 F.3d at 1000.  "AEDPA spells out what this presumption means: State-court fact-finding may be overturned based on new evidence presented for the first time in federal court only if such new evidence amounts to clear and convincing proof that the state-court finding is in error." *Id*. (citing 28 U.S.C. § 2254(e)(1)); *Hibbler v. Benedetti*, 693 F.3d 1140, 1146

6

(9th Cir. 2012) (noting that "a federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable") (quoting *Taylor*, 366 F.3d at 999).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the federal habeas court looks to the last reasoned opinion from the state courts. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). It should then presume that the "unexplained decision adopted the same reasoning" as the last reasoned decision. *Id.* When the state court has rejected a claim on the merits without explanation, this court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

In its unpublished disposition issued on June 27, 2016, the state appellate court addressed the merits of petitioner's *Miranda* violation claim. Resp. Exh. E at 3-13. Therefore, the last reasoned decision as to that claim is the state appellate court's unpublished disposition. *See Wilson*, 138 S. Ct. at 1192.

Petitioner raised her remaining claims on collateral review in the state courts. *See* Resp. Exhs. G, K, L. In a reasoned decision, the state superior court denied the destruction of evidence, sentencing and IAC claims, which she had raised in her state habeas petition. *See* Resp. Exh. J. These claims were summarily denied by the state appellate and supreme courts. *See* Resp. Exhs. K, L.

**B.     CLAIMS FOR RELIEF**

As grounds for federal habeas relief, petitioner claims: (1) her statements to police were introduced in evidence in violation of *Miranda*; (2) police failed to preserve potentially exculpatory evidence; (3) her sentence is cruel and unusual in violation of the Eighth Amendment; and (4) an IAC claim.

7

1.       *MIRANDA* VIOLATION CLAIM

Recordings of petitioner's first and second interviews with Officer Santiago were admitted into evidence and played at trial, and copies of the transcripts of the recordings were also admitted to assist the jury to follow along with the recording.  4RT 597-605; Resp. Exh. B; Augmented Clerk's Transcript ("ACT") 2-46.  At trial, the defense sought to introduce petitioner's apology letter into the evidence for impeachment purposes over the prosecutor's objection.  4RT 614-616. Thereafter, the trial court listened to arguments by the parties and admitted a redacted version of the letter into evidence.  4RT 642-652.

Petitioner contends that the police violated her rights under the Fifth and Fourteenth Amendments by continuing to question her after she unambiguously invoked her right to remain silent.[6]  As mentioned above, petitioner raised this *Miranda* violation claim as her sole claim on direct review.  Specifically, she argues that she did not explicitly waive her *Miranda* rights and that questioning continued after she invoked her right to remain silent.  Specifically, after answering the Officer Santiago's questions about the events just prior to the shooting, petitioner was asked by the officer, "And then what happened?"  Petitioner then invoked her right to remain silent by stating as follows: "And then, then I think I shouldn't say any more from there." Petitioner contends that the remainder of that police interview, the entirety of a second police interview, and her apology letter written at the officer's prompting should have been suppressed

---

[6] In her traverse, petitioner points out that during the motion to suppress hearing, trial counsel argued there were three junctures during petitioner's first police interview with Officer Santiago in which she asserted her *Miranda* rights, but in the instant action petitioner relies on only the second purported invocation of her right to remain silent. Petitioner states as follows:

Petitioner recognizes that the first invocations of rights trial counsel pointed to—Petitioner's question to [Officer] Santiago whether she should have an attorney present and her statement that she did not know if she should have an attorney—did not unambiguously express a desire to have counsel present.  But there was nothing ambiguous in Petitioner's invocation of her right to remain silent that trial counsel pointed to as the second assertion of her *Miranda* rights and that soon followed her statement that she did not know if she should have an attorney present.

Trav. at 7.

8

by the trial court.  Petitioner further contends that the trial court's error in refusing to suppress her statements was prejudicial.

The factual background of this claim, as described by the California Court of Appeal and reasonably supported by the record, is summarized below (Resp. Exh. E at 4–8).

Prior to trial, petitioner filed a motion seeking an Evidence Code § 402 hearing to determine the admissibility of the two police interviews and the letter of apology.  The prosecution filed a motion seeking to admit all of petitioner's post-*Miranda* statements.  The prosecution argued that petitioner was advised of her *Miranda* rights during the first police interview, that she waived her rights, and that she did not make an unequivocal and unambiguous invocation of her rights thereafter.

At the hearing on the parties' motions, the trial court listened to an audio recording of petitioner's first police interview and was provided a transcript by the prosecution.  The parties stipulated that the court could rely on or use the transcript as an aid to the audio recording.

At the beginning of the first police interview, Officer Santiago asked petitioner for her name and then immediately advised her of her *Miranda* rights—the right to remain silent, the consequences of forgoing that right, the right to the presence of an attorney, and the right to appointment of an attorney if petitioner was indigent.  Petitioner indicated that she understood her rights and proceeded to answer the officer's questions.

Officer Santiago asked petitioner generally what had occurred and then followed up with more specific questions.  Petitioner stated that she had gotten into an argument with her boyfriend, Huynh, on the phone.  At the time, her boyfriend was at the house of the victim, Pham, who was the mother of his children.  While petitioner was on the phone with her boyfriend, the victim started "talking shit" to petitioner by phone and by text.  The victim told petitioner to "meet up" with her.  Petitioner and a friend, who drove petitioner's car, went to meet the victim.

Officer Santiago eventually asked, "[W]here did you guys meet up at?"  Petitioner responded, "*Mm, we met up at um, should, should I have an attorney present?  I don't know if uh,*

9

*I should have an attorney present.*"  ACT 8 (italics added).  The officer responded that he was trying to get petitioner's side of the story.  Petitioner stated that they met at a store.

 Petitioner thereafter continued to answer the officer's questions about what happened. Petitioner indicated that the victim, the victim's boyfriend, and petitioner's boyfriend approached the front of petitioner's car on foot.  The following exchange then occurred between Officer Santiago and petitioner:

MY LOAN     And I thought they were gonna come up, uh, you know?

SANTIAGO    And then what happened?

MY LOAN     *And then, then I think I shouldn't say any more from there.*

SANTIAGO    Well, like I said, I, I'm just tryin' to get your side of the story, I mean, it sounds like, like your—

MY LOAN     And—

SANTIAGO    Your baby daddy, you know, caused some drama.

MY LOAN     He did.

SANTIAGO    And—

MY LOAN     He's always like that.

SANTIAGO    Yeah, see, well, well, you know, uh—

MY LOAN     And then they came at me, so, man, I'm pregnant,[7] I, I ain't gonna fight with her.

SANTIAGO    Well, see—

MY LOAN     And I don't (inaudible)—

SANTIAGO    The thing is that, that I don't know you, I don't know him, I don't know her.

MY LOAN     So you're just . . .

---

[7] Petitioner stated that she was 8 weeks pregnant at the time of the incident.  ACT 5.

United States District Court
Northern District of California

1

2    SANTIAGO    So, so that's why—

3    MY LOAN     Getting the background.

4    SANTIAGO    Hold on, so—

5    MY LOAN     He has a warrant too.

6    SANTIAGO    Does he?

7    MY LOAN     Yeah, he does.

8    SANTIAGO    So that, that's why I'm trying to get your side of the story, because I, I
9                wanna understand what happened from your perspective, and if you're
10               tellin' me that, that your baby daddy started some drama, then . . .

11   MY LOAN     He did.

12   SANTIAGO    I mean, I, I, I, if I go ask him that, he's probably gonna give me a different
13               story, right?

14   MY LOAN     Yeah, you can ask him that.

15   SANTIAGO    So, so that, that's why . . .

16   MY LOAN     (Inaudible.)

17   SANTIAGO    I wanna get your side of the story, so I understand from your perspective. . .

18   MY LOAN     Yeah, I got so many . . .

19
20   SANTIAGO    What occurred.

21   MY LOAN     People to vouch for me, that he's just (inaudible), and he's—

22   SANTIAGO    Okay.

23   MY LOAN     But anyway, yeah, and—

24   SANTIAGO    Well, that, that's what I'm saying—

25   MY LOAN     And they came up, they were in front of my car, and then I come, like, to
26               here, and they're comin' at me, so, so I do what I had to do, and they left, I
                 don't know.
27

28                                               11

SANTIAGO   So you had to do what you had to do, what do you mean by that?

MY LOAN   *I don't know, you know what, I think that, I, I don't think I should say anything, I . . . need an attorney, I don't know.*[8]  I don't know, just like, and they, he started shit, he, they called me out, yeah, I was, three of 'em standing, but I'm pregnant, you know, so, that's, I—I ain't gonna have her beat on me, I'm pregnant.  And you know, she had two guys with her.  So, yeah.  So.

ACT 11-13 (italics and footnotes added).  Petitioner then indicated that after the incident occurred, she and her friend drove away.  The officer asked what happened to the gun, but petitioner did not provide a direct answer.

After the recording of petitioner's first police interview was played for the trial court, the court heard argument from the parties.  Petitioner contended that she had clearly invoked her right to counsel and/or her right to remain silent on the following three occasions during the interview: (1) "Mm, we met up at um, should, should I have an attorney present? I don't know if uh, I should have an attorney present"; (2) "And then, then I think I shouldn't say any more from there"; and (3) "I don't know, you know what, I think that, I, I don't think I should say anything, I . . . need an attorney, I don't know."  Petitioner contended that the officer continued to interview her in violation of her Fifth Amendment rights, and that her second interview at the police station and the apology letter should also be suppressed.  The prosecution contended that petitioner did not clearly invoke her right to counsel or to remain silent.  The trial court took the matter under submission. The following day, the court denied petitioner's motion to exclude her post-*Miranda* statements. 3RT 351.  The court found that petitioner's three cited statements during the first police interview, individually or in totality, were not an unequivocal and unambiguous invocation of her rights. 3RT 349-351.  Specifically, the trial court relied on *Davis v. United States*, 512 U.S. 452 (1994),

---

[8] The state appellate court quoted from the transcript of the audio recording of petitioner's statement to the police.  The trial court, in making its ruling, appeared to rely on the transcript.  However, in referring to this particular statement by petitioner, the trial court quoted her as saying, "'I think I shouldn't say,' period.  'I need an attorney,' period.  'I don't know.' End of quote."  The state appellate court noted that the minor differences between the transcript of the audio recording and what the trial court apparently determined was stated by petitioner at this point was "not material to [its] analysis."  *See* Resp. Exh. E at 7 fn. 3.  This Court agrees with the state appellate court and finds that such a discrepancy does not affect its analysis.

United States District Court
Northern District of California

and stated as follows:

> . . . [I]ndividually as to each statement and in totality, the Court finds that there was no unequivocal and unambiguous invocations of the defendant's rights and, therefore, the defense motion to exclude defendant's statements, both the oral statements through the oral interview and the letter of apology, that motion is denied.

3RT 350-351.  As mentioned, the recording of the first interview was played at trial.  4RT 597-600.

The following summary of petitioner's second interview with Officer Santiago is taken from the record.  As stated above, the recording of the second interview was also played at trial. 4RT 603-05.

Petitioner was booked into jail and interviewed again at the jail's preprocessing center. 4RT 601-02.  Officer Santiago read petitioner her *Miranda* rights a second time, and she again agreed to speak to the police.  4RT 605.  On that occasion, petitioner said that Pham, Tri, and Huynh were "behind a bush or something" and that they walked up to her and "hit [her] car." ACT 24-26.  They were yelling "stupid shit" at her.  ACT 30.  Petitioner was in the passenger side of her car.  ACT 26.  Petitioner told her friend to "take off," and petitioner fired a gun out the passenger side window.  ACT 31-34, 37.  She fired "[t]wo or three" shots.  ACT 31, 34.  She explained to Officer Santiago, "I wasn't shooting at them . . . .  [T]hey were coming towards my car so I just put my hand out the window . . . ."  ACT 32; *see* ACT 34, 37.  When the officer clarified where she pointed the gun, she replied, "No, I didn't point it at them . . . .  I pointed it at the ground.  I didn't hit them.  I didn't hit them, right?  No, I didn't."  ACT 33.  She threw the gun out the window of her car as they drove off.  ACT 37.  When the officer told petitioner that Pham was shot, petitioner replied, "Oh, that's what she gets.  I'm sorry, but (unintelligible)."  ACT 33. When the office clarified what petitioner meant by "That's what she gets," she replied: "Well 'cause she was the one that came at me.  She came at me."  ACT 33.

When the officer asked why petitioner decided to "leave [her] house in the first place," she explained that she got angry because they continued to call her, stating:

13

. . . they kept callin' me.  I wasn't gonna leave my house, I was sleepin' and they kept
calling me . . . .  'Cause I already hung up on them.  I already hung up on them, I wasn't
answering the phone.  They just kept calling.  And then they're talkin' shit, like, hella
talkin' shit.  So, I got real pissed.

ACT 40.  Petitioner explained she got the gun from a secret location in her neighborhood before
leaving to meet Pham, stating as follows: "[A]nd then I went over to get Cindy and then they kept
callin' me on the way.  So, I said, 'You know what, fuck it, I'm gonna go get the thing.'"  ACT
38-39.  When the officer asked why petitioner brought a gun, she responded: "I figure I'm
pregnant and I need to fight with them."  ACT 38.  When the officer asked whether petitioner felt
sorry about what she did, she said, "I feel bad . . . . [Y]eah, it shouldn't have happened, but this
dumb bitch shouldn't have got drunk and called me up.  But yeah, I feel bad, like, come on, she
used to be my friend."  ACT 42.

Officer Santiago testified that petitioner did not appear to be nervous during the interview,
and he thought she did not genuinely express remorse for her actions.  4RT 608-611.  She did not
cry, but, instead, laughed during the interview.  4RT 609, 611.  She seemed evasive at times.  4RT
608.  On cross-examination, Officer Santiago testified that after the second interview, petitioner
agreed to write an "apology letter," the admission of which the defense successfully requested in
order to impeach the officer's testimony about petitioner's lack of remorse.  4RT 613-616, 642-
652.  In the redacted letter, petitioner stated, "I made a huge mistake tonight, probably the biggest
mistake of my life."  4RT 616.  She added, "I know that there is no excuse for my behavior.  I do
wish to apologize for my actions."  4RT 616.  She also stated, "I am very sorry for what I did."
4RT 617.  Lastly, she wrote, "If I could, I would have handled the situation a lot differently. . . .
In a way that there wouldn't be anyone resulting of [sic] any injuries."  4RT 616.

On direct review, the state appellate court determined that the trial court did not err by
declining to exclude from evidence petitioner's two police interviews and her letter of apology.
Resp. Exh. E at 13.  Thus, the court rejected petitioner's *Miranda* violation claim.  The court
stated as follows:

We determine that a reasonable officer would not have understood defendant's
statement, "I think I shouldn't say any more from there," was an unequivocal and

14

unambiguous invocation of the right to remain silent.  (*Nelson*, *supra*, 53 Cal. 4th at p. 380.)

First, defendant's statement contained ambiguous or equivocal language.  Her statement was prefaced with "I think," which the California Supreme Court has characterized as "ambiguous qualifying words."  (*Bacon*, *supra*, 50 Cal. 4th at p. 1105; *accord*, *Shamblin*, *supra*, 236 Cal. App. 4th at p. 20 ["'I think'" is equivocal language].)  Moreover, statements similar to defendant's statement have been found to be equivocal or ambiguous by California courts.  (*Bacon*, *supra*, at p. 1105 ["'I think it'd probably be a good idea for me to get an attorney'"]; *Stitely*, *supra*, 35 Cal. 4th at p. 535 ["'I think it's about time for me to stop talking'"]; *Shamblin*, *supra*, at p. 20 ["'I think I probably should change my mind about the lawyer now . . . .  I think I need some advice here'"].)

Second, in considering the context in which defendant made the statement, the record reflects that defendant continued to talk freely to the officer after making the statement.  (See *Shamblin*, *supra*, 236 Cal. App. 4th at p. 20 ["that defendant did not intend to terminate the interview is clear from the exchange that immediately followed"].)  Immediately after defendant stated, "I think I shouldn't say any more from there," the police officer started talking but barely finished one sentence before defendant interrupted him.  As the officer continued to try to speak, defendant repeatedly interrupted him, including at times to express agreement with what the officer was saying.  The officer was unable to complete more than one sentence before defendant again interjected.  The officer even said to defendant, "Hold on, so—," but he was interrupted by defendant.  The conversation continued, and defendant eventually interrupted the officer to say that the victim, the victim's boyfriend, and defendant's boyfriend were "comin' at me, . . . so I do what I had to do," apparently in reference to shooting the victim from the vehicle.  Defendant made this statement even though the officer had not posed a question to her immediately prior to this statement.

Thus, rather than ceasing to talk after making the statement, "I think I shouldn't say any more from there," defendant displayed an ongoing willingness to talk to the officer.  In view of the words defendant used ("I think I shouldn't say any more from there") and her eagerness to talk right after making the statement, it was reasonable for the officer to interpret the statement as an equivocal reference to remaining silent.  (*Nelson*, *supra*, 53 Cal. 4th at p. 380.)

Third, the statement at issue was made between two other ambiguous and equivocal references to counsel and/or to remaining silent.  Defendant concedes that her first mention of an attorney ("[S]hould I have an attorney present?  I don't know if . . . I should have an attorney present.") "did not unambiguously express a desire to have counsel present."  Likewise, defendant's last reference to an attorney and to not talking ("I don't know, you know what, I think that, I, I don't think I should say anything, I . . . need an attorney, I don't know.") was equally ambiguous and unequivocal, given her repeated "I don't know" statements and the fact that she continued to talk about the incident thereafter without any comment from the officer.

15

Given the qualifying words that defendant used in all of her references to an attorney and to remaining silent, and given that she continued to talk freely right after making each of the three statements concerning an attorney and/or remaining silent, we determine that defendant's statement, "I think I shouldn't say any more from there," was not sufficiently clear that a reasonable police officer would understand the statement to be an invocation of the right to remain silent (*Nelson*, *supra*, 53 Cal. 4th at pp. 376, 380). Because we determine that defendant's *Miranda* rights were not violated, we need not address whether she was prejudiced by the admission of the statements that she made after the asserted invocation of the right to silence.

Resp. Exh. E at 11-13.

*Miranda* requires that a suspect be given certain warnings and must waive those warnings before he may be subjected to a custodial interrogation.  384 U.S. at 479.  "[U]nless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him."  *Id.*; *see also Oregon v. Elstad*, 470 U.S. 298, 306 (1985) (referring to the "*Miranda* exclusionary rule").  The requirements of *Miranda* are "clearly established" federal law for purposes of federal habeas corpus review under 28 U.S.C. § 2254(d). *Juan H. v. Allen*, 408 F.3d 1262, 1271 (9th Cir. 2005); *Jackson v. Giurbino*, 364 F.3d 1002, 1009 (9th Cir. 2004).

*Miranda* requires that a person subjected to custodial interrogation be advised that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney."  384 U.S. at 444.  The warnings must precede any custodial interrogation, which occurs whenever law enforcement officers question a person after taking that person into custody or otherwise significantly deprive a person of freedom of action.  *Id.*

Clearly established Supreme Court law, as set forth in *Miranda* itself, requires that questioning should end once the suspect expresses his desire to maintain silence.  *See id.* at 473-74 ("If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.").  However, an accused who wants to invoke his right to remain silent must do so unambiguously.  *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010).

16

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Similarly, in the context of another *Miranda* right, the right to the presence of an attorney during interrogation, the Supreme Court has held that after a valid *Miranda* waiver, an invocation of that right only halts interrogation when it is clear and unambiguous. *Davis v. United States*, 512 U.S. 452, 459-61 (1994). A state court's application of the *Davis*' "clear statement" rule to the invocation of the right to remain silent after *Miranda* waiver is not contrary to or an unreasonable application of Supreme Court precedent for purposes of section 2254(d). *DeWeaver v. Runnels*, 556 F.3d 995, 1002 (9th Cir. 2009) (no habeas relief available where state court had concluded that suspect asking to be taken back to jail did not evidence a refusal to talk further and was not an invocation of right to remain silent). Furthermore, officers are not required to clarify an ambiguous statement. *See Davis*, 512 U.S. at 461-62.

Habeas relief may be granted, however, only if the admission of statements in violation of *Miranda* had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Pope v. Zenon*, 69 F.3d 1018, 1020 (9th Cir. 1995)[9] (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Here, petitioner claims that her statement during the first police interview, "I think I shouldn't say any more from there," ACT 11, was an unequivocal invocation of her right to remain silent, and that the remainder of that police interview, the entirety of a second police interview, and her apology letter should have been suppressed by the trial court. Petitioner further contends that the trial court's error in refusing to suppress her statements was prejudicial.

As mentioned, the trial court conducted an evidentiary hearing regarding the admissibility of petitioner's statements to police during the two police interviews and her apology letter. 3RT 338-351. The state appellate court affirmed the trial court's denial of the motion to suppress her statements. Resp. Exh. E at 13. The record demonstrates that petitioner had a full, fair, and complete opportunity to present evidence in support of her claim to the state courts, of which she

---

[9] *Overruled on other grounds by United States v. Orso*, 266 F.3d 1030, 1038 (9th Cir. 2001, *abrogated on other grounds by Missouri v. Seibert*, 542 U.S. 600 (2004).

17

took full advantage.  Thus, the court finds that the state court's fact-finding process survives intrinsic review.  *See Hibbler*, 693 F.3d at 1146.  However, petitioner fails to present clear and convincing evidence to overcome the presumption of correctness of the state court's factual findings.  The record shows that during the first police interview, Officer Santiago read petitioner her *Miranda* rights prior to questioning her at the back seat of his patrol car, and petitioner stated she understood them.  4RT 595-596; ACT 2.  Thus, petitioner impliedly waived her *Miranda* rights when she first started speaking with Officer Santiago.

Whether petitioner unambiguously invoked her *Miranda* rights after initially waiving them is a separate question.  As mentioned above, after Officer Santiago asked petitioner what happened after the victim and her boyfriend approached the vehicle, petitioner responded, "I think I shouldn't say any more from there."  ACT 11.  Petitioner claims at this point, she invoked her right to remain silent, which required Officer Santiago "to cease questioning her, and [Officer] Santiago violated her Fifth and Fourteenth Amendment rights by continuing the first interview and by conducting the second interview and prompting her to write the apology letter."  Trav. at 7. However, the trial court denied petitioner's motion to suppress the aforementioned statements when it relied on *Davis* and found that "there was no unequivocal and unambiguous invocations of the defendant's rights and, therefore, the defense motion to exclude defendant's statements, both the oral statements through the oral interview and the letter of apology . . . ."  3RT 350-351.  The state appellate court agreed that the statement at issue "contained ambiguous or equivocal language" because it "was prefaced with 'I think,' which the California Supreme Court has characterized as 'ambiguous qualifying words.'"  Resp. Exh. E at 11.  The court also considered "the context in which [petitioner] made the statement," and reasoned that the totality of the circumstances—including "her eagerness to talk right after making the statement [that she preferred to maintain silence]"—made it "reasonable for the officer to interpret the statement as an equivocal reference to remaining silent."  *Id.* at 12.  Such a showing, in the absence of circumstances suggesting a contrary finding, is sufficient to establish petitioner's statement, "I

think I shouldn't say any more from there," was an unambiguous invocation of her right to remain silent. *Cf. Clark v. Murphy*, 331 F.3d 1062, 1070 (9th Cir. 2003) (holding that state court's conclusion that "I think I would like to talk to a lawyer" and "should I be telling you, or should I talk to an attorney?" were not unambiguous requests for counsel was not objectively unreasonable application of *Davis*), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

Petitioner contends that the trial court erred in denying her motion to suppress because she claims that "she did not use any qualifying language that made her desire to remain silent unclear." Trav. at 8. She contends that "at that point in the interview she had changed her mind about talking to [Officer] Santiago and now thought it was in her interests not to say more." *Id.* But no factual basis in the state court record exists to support petitioner's contentions. First, her assertion that she "did not use any qualifying language" is contradicted by the record, which shows that the statement was "*I think* I shouldn't say any more from there," ACT 11 (italics added), and the trial court found that her use of the words "I think" made her statement "not an invocation" of her right to remain silent. 3RT 350. Specifically, the trial court noted that such a finding was "consistent with a number of California cases and other jurisdictions where courts have found conditional statements to be ambiguous." 3RT 349. The trial court relied on *Clark*, stating: "*Clark v. Murphy*, a Ninth Circuit Court [case], 2003, 331 F.3d 1062, pinpoint 1070-1072, quote, "I think I would like to talk to a lawyer," that court found [it] to be an ambiguous statement." 3RT 349-350. Petitioner's claim that such a statement showed that she had changed her mind about speaking with Officer Santiago was rejected by the trial judge who listened to the taped interview and read the interview transcript. *See* 3RT 315, 338-351. As such, the trial court found that "in totality . . . there was no unequivocal and unambiguous invocation of [petitioner's] rights . . . ." 3RT 351. Those determinations were affirmed by the state appellate court that reviewed the record, including the transcript of the interview. *See* Resp. Exh. E at 11-13. Although petitioner disagrees with the factual determinations made by the state courts, she points to no material fact that any court failed to consider or to any inaccuracy in the state court record.

19

Under these circumstances, the court must defer to the state courts' findings, which are reasonable and therefore binding in these proceedings under section 2254(d)(2). *Taylor*, 366 F.3d at 1000.

Second, the state courts' determination that petitioner's statements to police and apology letter were admissible constitutes a reasonable application of pertinent federal law within the meaning of section 2254(d)(1). As explained above, the trial court denied the motion to suppress based on that court's finding that, under the circumstances of this case, petitioner did not invoke her right to remain silent when she said, "I think I shouldn't say any more from there." 3RT 350-351. The state appellate court specifically determined that the aforementioned statement "was not sufficiently clear that a reasonable police officer would understand that statement to be an invocation of the right to remain silent." Resp. Exh. E at 13. Accordingly, the state courts' determination—that no *Miranda* violation resulted because petitioner's statement was ambiguous—must stand.

Furthermore, the Court finds that the state courts' conclusion that petitioner's *Miranda* rights were not violated was neither contrary to nor an objectively unreasonable application of federal law. 28 U.S.C. § 2254(d)(1). As mentioned above, an accused who wants to invoke his right to remain silent must do so unambiguously. *Berghuis*, 560 U.S. at 384. In *Berghuis*, the Supreme Court found the defendant did not unambiguously invoke his right to remain silent by not speaking for the first two hours and 45 minutes of a three-hour interrogation. *Id.* at 375-76, 381-82. Because he did not say he wanted to remain silent or that he did not want to talk to the police, he did not invoke his right to remain silent. *Id.* at 382. Similarly, in *Davis*, the Supreme Court found that the suspect's statement, "maybe I should talk to a lawyer," did not constitute an unequivocal request that required the interrogation to cease. *See* 512 U.S. at 462. Here, the state courts did not unreasonably apply Supreme Court law in *Miranda* or even in either *Berghuis* or *Davis* in rejecting petitioner's claim that her statement, "I think I shouldn't say any more from there," was an unambiguous invocation of her right to remain silent. *See* Resp. Exh. E at 11; *see also* 3RT 349-351. The state courts reasonably found that the statement contained ambiguous or

20

United States District Court
Northern District of California

equivocal language, relying in part on *Clark*, in which the Ninth Circuit held that a state court's determination that "I think I would like to talk to a lawyer" was ambiguous was not an unreasonable application of federal law. *See* 331 F.3d at 1069, 1071. Moreover, numerous other federal court decisions have found that alleged invocations of the right to remain silent or right to counsel prefaced with words such as "I think" do not constitute unequivocal invocations. *See Williams v. Horel*, 341 F. App'x 333, 335 (9th Cir. 2009) ("Here Williams said similarly, 'I think first, um, I should have a lawyer.' Under *Davis*, that statement was ambiguous and equivocal."); *United States v. Potter*, 927 F.3d 446,451 (6th Cir. 2019) (noting Sixth Circuit's prior holding that statement, "I think I should talk to a lawyer, what do you think?" was equivocal invocation); *United States v. Mohr*, 772 F.3d 1143, 1146 (8th Cir. 2014) ("Mohr's statement 'I think I should get [a lawyer]' was not an unequivocal invocation of his right to counsel."); *Burket v. Angelone*, 208 F.3d 172, 197 (4th Cir. 2000) (defendant's statement to the police "I think I need a lawyer" did not constitute an unequivocal request for counsel). In addition, the court has found no post-*Davis*/*Berghuis* case finding a statement similar to petitioner's, i.e., prefaced with "I think," to be an unambiguous invocation of the right remain silent.

Based on the above, this court finds that the state appellate court's rejection of petitioner's *Miranda* violation claim was based on a reasonable determination of the facts under section 2254(d)(2) and on a reasonable application of clearly established federal law under section 2254(d)(1).

Even if admission of petitioner's statements and letter of apology were erroneous, the error cannot be said to have had a substantial and injurious effect on the jury's verdict, given the overwhelming independent evidence introduced against petitioner at trial. *See Brecht*, 507 U.S. at 637.

In the present case, there was strong evidence of petitioner's guilt. By the time petitioner made the alleged invocation of her right to remain silent, she had already admitted that she had a heated argument with Pham over the phone and that they had agreed to meet up on the early

21

morning of October 25, 2012.  ACT 6-10.  Furthermore, the circumstantial evidence that petitioner was the shooter was overwhelming.  The record shows that petitioner was taken into custody moments after shooting, when her vehicle, a silver Mercedes, was stopped a short distance from the scene of the shooting.  4RT 589-594.  When Officer Santiago passed the Mercedes, the driver ran a red light and fled at a high rate of speed.  4RT 590.  Officer Santiago made a "high-risk vehicle stop" and found petitioner in the passenger seat.  4RT 591, 593.  There was an unspent 9-millimeter round on the floorboard and a spent casing on the exterior of the vehicle near the windshield wiper.  4RT 594-595.  When petitioner was taken into custody, Officer Santiago immediately placed bags over her hands, and gunshot residue was found on both hands.  4RT 594, 596-597, 624-625, 627, 704.

The circumstances of the altercation between Pham and petitioner and their agreement to meet at the shopping center to resolve their problems was also established by independent and undisputed testimony by Pham.  4RT 437-440.  Thus, the only significant matter which was established by the admission of the remainder of petitioner's statements from both interviews was her state of mind when she shot at Pham and Pham's companions.  *See* ACT 11-13, 38-40.  Specifically, petitioner admitted to Officer Santiago she stopped on her way to the meeting to pick up a gun because she was angry and was unable to physically fight Pham due to her pregnancy.  *See id.*  However, even without this admission the aforementioned evidence presented at trial from eye-witness testimony that Pham was shot at from petitioner's car and expert testimony regarding the gunshot residue found on petitioner's hands established that petitioner brought a gun to the meeting and used it to shoot at Pham.  Therefore, such evidence would have shown premeditation.

Finally, the record shows that admission of the statements allowed the defense to present the theory that petitioner did not point the gun at Pham but rather she fired into the ground because during the second interview, petitioner expressed surprise that she hit Pham.  ACT 33.  This evidence supported the defense expert testimony that the bullets hit an intervening object before striking Pham.  *See* 5RT 776, 782.  Also, the defense presented evidence of petitioner's apology

22

letter to Pham as impeachment evidence because Officer Santiago had testified about petitioner's lack of remorse.  4RT 614-616, 642-652.

Therefore, it cannot be said that the admission of petitioner's statements to police and letter of apology had a substantial or injurious effect on the verdicts.  Accordingly, petitioner is not entitled to federal habeas relief on her *Miranda* violation claim.

2.    DESTRUCTION OF EVIDENCE CLAIM

Petitioner contends that her constitutional rights were violated when police failed to preserve an audio recording of an interview with the victim.  In essence, petitioner contends her constitutional rights were violated by the denial of her pre-trial *Trombetta/Youngblood* motion.

Before trial, petitioner filed a motion to dismiss or for other relief for "failure of law enforcement agencies to collect or preserve evidence" that is "likely exculpatory," in violation of *Trombetta* and *Youngblood*.  Vol. 1, Clerk's Transcript ("1CT") 221-226; 3RT 316-317, 328-329.  After the shooting, Officer Heinrich had gone to the hospital and took a recorded statement from Pham.  4RT 547-548.  Officer Heinrich attempted to upload the statement to the "DCS"[10] and summarized the statement in a report.  4RT 549; 1CT 228-229.  At the time of the motion, the defense had been advised that the audio recording was "gone."  1CT 221-222.[11]  The defense argued that the failure to preserve the recording violated due process and moved for dismissal of the charges or, in the alternative, a jury instruction on the police's failure to preserve the audio recording and how the jury may infer such evidence would have been favorable to the defense.  1CT 225.

An evidentiary hearing was held on petitioner's *Trombetta/Youngblood* motion.  4RT 546-553.  Officer Heinrich testified that after the shooting in the early morning of October 25, 2012, he was asked to go to Valley Medical Center to check on the "medical condition" of Pham.  4RT 547.

---

[10]  "DCS" is a "company that provides hard drives for [police] at work where [police] can upload the audio."  4RT 549.

[11]  The court notes that page 2 of the *Trombetta/Youngblood* motion does not have a stamped Clerk's Transcript page-number.  *See* Dkt. 13-1 at 232.  Thus, the missing page will be cited as "1CT 221-222."

United States District Court
Northern District of California

He spoke to Pham and recorded the conversation.  4RT 547-48.  Afterwards, Officer Heinrich claims he attempted to upload the recorded statement to the DCS, stating as follows: "You just connect your recording device usually through a USB cable.  And then it's just a series of programs you have to open and then windows you have to open to get it to successfully upload onto the server."  4RT 548-549.  Officer Heinrich recalled going through the motions of uploading the statement and believed he had done so.  4RT 549.  He noted in his police report that he had uploaded the statement.  4RT 549; *see* 1CT 229.

Officer Heinrich had since searched for a copy of the audio recording of Pham's statement, but he could not locate it.  4RT 549-550.  When the prosecutor asked whether Officer Heinrich had any personal knowledge what had happened to it, the following exchange took place:

> A.     Quite honestly, I think that I—I mean, I went through the motions like I normally do.  I think I just made an error, and it didn't upload correctly.
>
> [PROSECUTOR] Q.  Are you guessing you must have made an error, or you are not sure?
>
> A.     No, I made an error because it's not on the server.  So I didn't upload it correctly.
>
> Q.     Is it possible it was deleted?
>
> A.     Deleted—yes, it's possible it just got lost in digital space.
>
> . . . .
>
> [DEFENSE COUNSEL] MS.  WALLMAN: Q. Officer  Heinrich, you said you uploaded
>                                                                     it onto the server, but it was never there.
>
> A.     I went through the motions to upload it the way I normally do, and obviously I
>             didn't do it correctly and it's not uploaded to the server.
>
> [PROSECUTOR] Q.  But you don't specifically recall making an error?
>
> A.     No.

4RT 549-50; *see* 4RT 582.  The prosecutor also asked Officer Heinrich about whether the audio recording could still be on his recording device, and the following discussion took place:

Q.    Officer Heinrich, once you upload an audio onto the DCS server, what do you do with your tape or your CD?  Do you destroy it or do you keep it—

A.    That's kind of what we were talking about, because I don't usually do that.  So I was checking my old recording devices, and it's possible that I still have it on a work-related USB, but I don't have that on me to check it.  So I'll still go home and see if I have my old USBs from two years ago, and maybe it has the information still and I'll be able to upload.

Q.    So it's your custom not to destroy the actual file once you upload it?

A.    No, not unless it's a critical investigation where you are out of space from the older case.  But usually I'll always try and keep it there in case something like this happens where I made a mistake.  And it's a good habit to upload it again, you know.

Q.    But to date you were not able to find your own copy?

A.    Last night I wasn't, but all I had last night was my recorder.  And the USB devices that I use are not with me right now.  They are at my house.

Q.    So you haven't been able to find it as of now?

A.    As of right now, no.

4RT 550-51.  After hearing testimony from Officer Heinrich, the court and the parties agreed to defer the issue to give the officer "the opportunity to make—to research and determine whether he had his original USB drive that would contain this recording which occurred more than two years ago" 4RT 552-553.  After a subsequent search, Officer Heinrich reported to the prosecutor that he could not locate the missing audio recording on any of his USB drives, and that he "doesn't believe there would be any recording anywhere else."  5RT 726-727.

After hearing argument from the parties, the trial court denied petitioner's *Trombetta/Youngblood* motion, explaining as follows:

In totality, the evidence and the circumstances surrounding the failure to provide the recording of the interview of the complaining witness, the Court rules and finds that the officer involved did not act in bad faith.  There was no bad faith involved in this case.  The Court also in review and in light of the evidence also does not find that the evidence was material and exculpatory in nature.  Unlike the evidence that was lost in the *Youngblood* case where DNA was involved, here we have a recording of an interview of the complaining witness where the officer also made a report, a written report, of the interview.  The officer was available to be cross-examined by the defense, and ultimately

25

the interview was reduced to writing as well.  And for those reasons, the Court does not find that the evidence was material or exculpatory in nature.  Further, the defendant did not suffer any prejudice or harm from it.

For all these reasons, the defense's *Trombetta/Youngblood* motion is denied.

5RT 728.

Petitioner raised his destruction of evidence claim on collateral review, by first filing a state habeas petition in the Santa Clara County Superior Court.  *See* Resp. Exh. G.  That court denied his claim, explaining as follows:

> Petitioner renews the *Trombetta/Youngblood* motion that was litigated in the trial court. (*California v. Trombetta* (1984) 467 U.S. 479 [102 L. Ed. 2d  413], *Arizona v. Youngblood* (1988) 488 U.S. 51 [102 L. Ed. 2d  281].)  Under this line of cases a defendant can show a due process violation if the state is responsible for the loss or destruction of evidence that would have helped the defense.  A defendant has to show either that there was an apparent exculpatory value to the evidence or that it was lost/destroyed in bad faith.  In Petitioner's case the trial court found there was no bad faith and that there was only speculation the lost recording of the victim's hospital interview would have any exculpatory value.  "A trial court's ruling on a *Trombetta* motion is upheld on appeal if a reviewing court finds substantial evidence supporting the ruling."  (*People v. Montes* (2014) 58 Cal. 4th 809, 837.)  In *Montes*, supra, the exculpatory value of a blood sample was deemed speculative. So too in this case Petitioner has provided only hopeful speculation that anything on the recording would have been impeachment, rather than corroboration, of the trial evidence. Closely on point is *People v. Alexander* (2010) 49 Cal. 4th 846, 878, in which the court observed the "claim that the erased audio tape had exculpatory value is based on speculation that something on it would have contradicted the evidence and testimony" presented at trial.

Resp. Exh. J at 3-4.  Petitioner raised her destruction of evidence claim in the state appellate and supreme courts, both of which denied the claim summarily.  *See* Resp. Exhs. K & L.

Where, as here, the last related state-court decisions have denied a claim summarily, the court should "look through" the unexplained decisions by the state appellate and supreme courts to the state superior court's decision that does provide a reasoned decision.  It should then presume that the "unexplained decision adopted the same reasoning" as the last reasoned decision.  *Wilson*, 138 S. Ct. at 1192.

The government has a duty to preserve material evidence, i.e., evidence whose exculpatory value was apparent before it was destroyed and that is of such a nature that the defendant cannot

26

obtain comparable evidence by other reasonably available means.  *See Trombetta*, 467 U.S. at 489; *Grisby v. Blodgett*, 130 F.3d 365, 371 (9th Cir. 1997).

Although the good or bad faith of the police is irrelevant to the analysis when the police destroy material exculpatory evidence, the analysis is different if the evidence is only potentially useful: there is no due process violation unless there is bad faith conduct by the police in failing to preserve potentially useful evidence.  *Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004); *Youngblood*, 488 U.S. at 58; *United States v. Sivilla*, 714 F.3d 1168 (9th Cir. 2013); *Villafuerte v. Stewart*, 111 F.3d 616, 625 (9th Cir. 1997).  Potentially useful evidence is "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant."  *Youngblood*, 488 U.S. at 57.  Another configuration of this test is that a constitutional violation will be found if a showing is made that (1) the government acted in bad faith, the presence or absence of which turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed, and (2) that the missing evidence is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  *Sivilla*, 714 F.3d at 1172 (internal quotation marks omitted).

Negligent failure to preserve potentially useful evidence is not enough to establish bad faith and does not constitute a violation of due process.  *See Grisby*, 130 F.3d at 371; *see, e.g.*, *Sivilla*, 714 F.3d at 1172 (finding that where exculpatory value of destroyed evidence was not apparent, government's negligent failure to preserve it did not establish bad faith).

Here, the state courts reasonably applied *Trombetta* and *Youngblood* in rejecting petitioner's claim that the police failed to preserve potentially exculpatory evidence in the form of an audio recording of Pham's interview.  As mentioned, the trial court held an evidentiary hearing into petitioner's *Trombetta/Youngblood* claim and heard testimony from Officer Heinrich.  After hearing that testimony, the trial court found no bad faith in the loss of the recording and determined that the evidence was neither material nor exculpatory in nature.  5RT 728.  The state court's factual findings—that there was no bad faith in the loss of the recording—is presumed to

be correct unless rebutted by petitioner.  *See* 28 U.S.C. § 2254(e)(1).  The record demonstrates that petitioner had a full, fair and complete opportunity to present evidence in support of her claim to the state court.  Therefore, the court finds that the state court's fact-finding process survives intrinsic review.  *See Hibbler*, 693 F.3d at 1146; *Taylor*, 366 F.3d at 999.

"Once the state court's fact-finding process survives this intrinsic review . . . the state court's findings are dressed in a presumption of correctness. . . ." *Taylor*, 366 F.3d at 1000.  As explained above, "AEDPA spells out what this presumption means:  State-court fact-finding may be overturned based on new evidence presented for the first time in federal court only if such new evidence amounts to clear and convincing proof that the state-court finding is in error." *Id.* (citing 28 U.S.C. § 2254(e)(1)).  In the instant matter, the state superior court upheld the trial court's findings and concluded petitioner had provided only "hopeful speculation" the lost recording would have any exculpatory value.  Resp. Exh. J at 3-4.  On federal habeas review, that finding is entitled to deference under section 2254(d)(2).  Petitioner fails to present clear and convincing evidence sufficient to overcome the presumption of correctness of the state court's factual findings.

However, the salient question under section 2254(d)(2) is whether the state superior court, applying the normal standards of appellate review, could reasonably conclude that the trial court's findings are supported by the record.  *See Lambert v. Blodgett*, 393 F.3d 943, 978 (9th Cir. 2004).

Here, petitioner claims the trial court erred in its findings that no bad faith was involved in Officer Heinrich's failure to preserve the audio recording and that such evidence was neither material nor exculpatory in nature.  Trav. at 21.  She argues that her due process rights were violated when the trial court failed to instruct the jury "on law enforcement's failure to preserve [Pham's] first recorded interview." *Id.*  Petitioner offers nothing beyond disagreement with the state court's finding, *see id.* at 18-21, which is insufficient to satisfy her burden to overcome the presumption by clear and convincing evidence.  Indeed, the record shows that the trial court made the finding that there were no bad faith actions on the part of Officer Heinrich, after listening to

28

his testimony that he made an apparent technical or user error in uploading Pham's statement. *See* 4RT 546-52. The trial court was in the best position to assess Officer Heinrich's credibility. *See Marshall v. Lonberger*, 459 U.S. 422, 434 (federal habeas courts have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them"). Further, petitioner's claim that the missing audio recording was "likely exculpatory" was rejected by the trial court, who found such evidence not to be material or exculpatory in nature because "[t]he officer was available to be cross-examined by the defense, and ultimately the interview was reduced to writing as well." 5RT 728. The trial court also found that petitioner "did not suffer any prejudice or harm from it." 5RT 728. Those determinations were affirmed by the state superior court that reviewed the record, including the transcript of Officer Heinrich's testimony and his written report of the interview. *See* Resp. Exh. J at 3-4.

In sum, petitioner has failed to demonstrate any flaw in the state court's fact-finding process, or present any evidence, let alone clear and convincing evidence, to support his claim. As such, the court may properly defer to the state court's findings. In this regard, the state superior court reasonably denied this claim upon concluding that the trial court did not err in denying petitioner's *Trombetta/Youngblood* motion because petitioner failed to establish bad faith on the part of police or that the contents missing audio recording would have been exculpatory. Based on the foregoing, the state superior court's rejection of this claim did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2). Accordingly, petitioner is not entitled to habeas relief on this claim.

3.   SENTENCING CLAIM

Petitioner contends her sentence is cruel and unusual in violation of the Eight Amendment. As mentioned, petitioner first raised this claim on collateral review in the Santa Clara County Superior Court, which rejected this claim as follows:

> Petitioner also presents a cruel and unusual punishment challenge to her sentence. Lengthy gun enhancements, such as Petitioner received, are routinely upheld because the "statutory provision punishes the perpetrator of one of the specified crimes more severely

29

1
2
3
4
5
6

for introducing a firearm into a situation which, by the nature of the crime, is already dangerous and increases the chances of violence and bodily injury." (See *People v. Garcia* (2017) 7 Cal. App. 5th 941, 953, citing *People v. Felix* (2003) 108 Cal. App. 4th 994.) Challenges similar to petitioner's were rejected in *People v. Riva* (2003) 112 Cal. App. 4th 981, 1003, and *People v. Martinez* (1999) 76 Cal. App. 4th 489, in which the defendants injured persons by shooting at them. In this case Petitioner fired multiple shots in the general direction of two people and it seems to be just random luck that nobody was hurt more seriously. In light of her individual culpability her cruel and unusual punishment claim must be rejected.

7
8
9
10
11

Resp. Exh. J at 4. Petitioner raised her Eighth Amendment claim again on collateral review in the state appellate and supreme courts, both of which denied the claim summarily. *See* Resp. Exhs. K & L. As mentioned above, this court "look through" the state appellate and supreme courts' summary denials to the state superior court's reasoned decision, and then presume that the California Supreme Court adopted the same reasoning. *See Wilson*, 138 S. Ct. at 1192.

12
13
14
15
16
17
18
19
20
21
22
23
24
25

A criminal sentence that is not proportionate to the crime for which the defendant was convicted violates the Eighth Amendment. *Solem v. Helm*, 463 U.S. 277, 303 (1983). Yet successful challenges to the proportionality of particular sentences are "exceedingly rare" outside "the context of capital punishment." *Id.* at 289-90. Eighth Amendment jurisprudence "gives legislatures broad discretion to fashion a sentence that fits within the scope of the proportionality principle—the precise contours of which are unclear." *Andrade*, 538 U.S. at 76 (internal quotation marks and citations omitted). "The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Ewing v. California*, 538 U.S. 11, 23 (2003) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring)). Where it cannot be said as a threshold matter that the crime committed and the sentence imposed are grossly disproportionate, it is not appropriate to engage in a comparative analysis of the sentence received by the defendant to those received by other defendants for other crimes. *See United States v. Harris*, 154 F.3d 1082, 1084 (9th Cir. 1998).

26
27

The Supreme Court upheld a life sentence without the possibility of parole for an offender whose sole felony conviction was for possessing 672 grams of cocaine. *Harmelin*, 501 U.S. at

28

United States District Court
Northern District of California

961, 994.  In *Andrade*, the Supreme Court, under the highly deferential AEDPA standard, upheld a sentence of two consecutive terms of 25 years to life for the nonviolent theft of $150 worth of videotapes.  538 U.S. at 63, 77.

Here, petitioner was sentenced to life with the possibility of parole consecutive to a twenty-year sentence after being convicted of one count of attempted premeditated murder and two counts of firing a gun from a vehicle at a non-occupant, with an enhancement on the attempted murder count for discharging a firearm.  2CT 464-468.  Her sentence consists of an indeterminate term of life with the possibility of parole for the attempted premeditated murder, and a consecutive determinate term of twenty years for personally discharging a firearm during the attempted murder.  2CT 464-468; s*ee also* Cal. Penal Code §§ 187, 189(a), 664(a), 3046(a)(1), 12022.53(a)(l)&(18), (c).  The trial court stayed her sentence on one of the counts of firing a gun from a vehicle at a non-occupant, and her sentence on the other count was run concurrently.  2CT 464-468.

Here, petitioner has not shown that the state courts' rejection of her sentencing claim was objectively unreasonable.  Petitioner was sentenced to an indeterminate life sentence plus a consecutive twenty-year sentence for violent crimes, which involved the use of a firearm.  If, as in *Harmelin*, a life sentence for a single, nonviolent, drug-possession conviction did not violate the Eighth Amendment, and if, as in *Andrade*, a sentence of fifty years to life for the nonviolent theft of videotapes also did not, then petitioner's sentence for her violent crimes also does not violate the Eighth Amendment.

Petitioner's claim that her sentence was cruel and unusual punishment is without merit, so the state courts' rejection of this claim was not contrary to, nor did it involve an unreasonable application of, clearly established Federal law.  Accordingly, petitioner is not entitled to relief on this claim because she failed to allege any federal constitutional error.

4.    IAC CLAIM

Petitioner claims that the first trial counsel she retained, Nelson McElmurry, Esq.,

31

provided ineffective assistance during the course of plea negotiations.  Specifically, she asserts that before trial, she rejected a twenty-year plea offer, but did so only because of ineffective assistance of Attorney McElmurry.

As mentioned above, on the early morning of October 25, 2012, petitioner was arrested and jailed.  1CT 42-44; 2CT 411.  Four days later, on October 29, 2012, the District Attorney filed a felony complaint against petitioner.  1CT 99.  Petitioner's maximum exposure under that complaint was nine years consecutive to twenty years, or twenty-nine years.  1 CT 99-101.  Petitioner was initially represented by the Public Defender's Office.  *See* 1CT 102-106.  On or about December 10, 2012, however, petitioner released the Public Defender and retained Attorney McElmurry, the attorney whose effectiveness she now challenges.  1CT 106.  Attorney McElmurry's first appearance in court was also on December 10, 2012.  1CT 106.  On December 20, 2012, Attorney McElmurry filed a motion to reduce petitioner's bail.  1CT 108.  In that motion, Attorney McElmurry correctly stated petitioner's then-exposure: nine years plus a twenty-year enhancement, or twenty-nine years.  1CT 109.  On December 28, 2012, the trial court denied the motion.  1CT 118.

Almost a year later, on October 29, 2013, the parties appeared for the preliminary hearing.  lCT 1.  Attorney McElmurry advised the trial court as follows:

> MR. MCELMURRY: After consulting with Ms. Nguyen, she is—she would like to retain different counsel at this point in time.  She is not happy with the overall progress of the case for various reasons and has indicated she would like to seek different counsel before proceeding.
>
> Additionally, an offer has been presented to her this morning through me, and that was a 20-year top/bottom offer, which is relatively significant, and she is asking for a brief continuance to at least consider that even of one day.
>
> In fairness to her, based on recent conversations with the previous prosecutor in the case, our understanding was that there would be no offers made or forthcoming.  And so learning of one this morning was certainly new for us and brand new for her to consider.  And, again, the 20-year  offer is relatively significant, especially considering that a life charge will likely be coming post-prelim.  So

1                    I think in light of that it's—it puts her in a very difficult  situation to
2    assess and decide whether or not that 20-year offer is in her best
     interest.

3    THE COURT:         All right.  Do the people wish to respond?

4    [PROSECUTOR] MR. WASLEY:   Yeah, briefly.

5

6                    The people are asking to proceed today, Your Honor.  My
     understanding from Ms. Tran, whose case this is, is that she had
7    mentioned to Mr. Attorney McElmurry a week ago or two weeks
     ago that he needs to come up with a number for her.  She never
8    heard from him.  I extended  a 20-year offer today based on my
     assessment of the case, and I think that is a fair disposition for an
9    early resolution.  It also requires me to amend one of the
     enhancements to make it a lesser enhancement.  I do intend to send
10   this up should the facts present as a premeditated attempted murder.

11

12                   I would object to a continuance.  We have a witness who we
     transported from San Joaquin County.  He was here on a body
13   attachment.  So it's the time and place for preliminary hearing and
     the people are asking to—either the defendant resolve the case or we
14   proceed to prelim.

15   THE COURT:         All right.  First with respect to counsel's representation that Ms.
     Nguyen wants to retain a different counsel, that request for a
16   continuance will be denied.  This is the date of the preliminary
     examination.  The complaint in this matter was filed about a year
17   ago, so this case has been around for quite a while.

18
                     With respect to the offer being made today, I'm certainly agreeable
19   to trailing the matter till this afternoon at 1:30 to give your client a
     couple of hours to think about it inasmuch as the representation's
20   been made that previous to today no determinate offer was made in
     the case.  But in view of the fact that we have a witness who had a
21   body attachment issued and who is in custody solely due to the body
     attachment, I'm not prepared to continue the case beyond the
22   trailing.

23
     MR. MCELMURRY: Your Honor, in that case, we'll proceed this morning.
24

25   THE COURT:         Okay.

26   1CT 3-5.  On November 20, 2013, petitioner was no longer represented by Attorney McElmurry

27   and was again appointed counsel from the Public Defender's Office.  1CT 161.  And, as

28                                     33

United States District Court
Northern District of California

mentioned above, her case later proceeded to trial.

Petitioner raised this IAC claim on collateral review in state court, by first filing her state habeas petition in the Santa Clara County Superior Court.  Through her petition and her own attached declaration, petitioner alleged as follows:

> I hired Mr. Nelson Attorney McElmurry to represent me after I was arrested on October 25, 2012.  Mr. Attorney McElmurry had my case for about a year and came to visit me about 3 to 4 times throughout that year.  In the beginning he told me that I would probably get a year or so for negligence discharge of a firearm.  Later on, a couple months down the line he told me that the D.A. was not budging and she wanted me to do the max.  She did not want to offer me any deals.  He never discussed to me the severity of my charges or explained to me about enhancements.  I had no knowledge of the law or court system.  At the time I was still set on a single digit sentence because of what he told me in the beginning.  I did not think I could have ever ended up with so much time more less a life sentence.
>
> On the day of my Preliminary Hearing Mr. Attorney McElmurry came into the holding cell and told me that my co-defendant just took a deal of 5 years and the D.A. just offered me a 20 year deal.  I was taken  aback.  I remember telling  him "I can't take 20 years.  That is like a life sentence, I'll be 50 years old when I get out" and he said "I know, I wouldn't take it either."  Then he left me in the holding cell and came back about fifteen minutes later and Mr. Attorney McElmurry told me that if I didn't take this offer that after Pre-lim they would be adding life charges.  When I heard this I panicked and was very conflicted.  I know I needed to think about this and get some more information before I made a decision so I asked Mr. Attorney McElmurry to ask the court for more time so I can consider my options.  I wanted to get all the details and then talk to my family to get their advice.  I needed Mr. Attorney McElmurry to explain everything clearly to me so I know what the 20 years consist of so I could make the best decision possible.  He never had time to explained what the life charges were going to be or how it was possible for me to get that much time.  Our conversation in the holding cell that day lasted no more than 5 minutes both times he came in to talk to me.  Mr. Attorney McElmurry requested for a continuance but the court did not grant it.  I know that had the court gave me a continuance and Mr. Attorney McElmurry took the time to explain to me about how much time each charge carries, I would have known that the gun enhancement alone added up to 20 years.  Knowing that, I would have taken the offer but since I was not fully advised correctly I denied the offer that day.

Resp. Exh. G (State Superior Court Pet., Exh. H at 1).

The state superior court ordered the prosecution to file an informal response to the habeas petition.  Resp. Exh. G, Order.  The prosecution filed a response, which included a declaration from Attorney McElmurry, which states a different version of events as follows:

34

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1. My name is Nelson McElmurry, and I am an attorney licensed to practice in the State of California.  I represented My Loan Nguyen through preliminary hearing on the above referenced case.

2. When I first appeared in the case, there was no offer to discuss with my client.

3. Through conversations with assigned [Deputy District Attorney ("DDA")] Oanh Tran, it was made clear that no offer would be forthcoming and we would have to make an offer to the People if we wanted to resolve the case.

4. Ms. Nguyen made it clear she would only accept an offer of single digits and she pushed for 5 years.  I did in fact offer a 5 year prison term to DDA Tran which she quickly rejected.  I later asked for 7 and floated the idea of a 9 year offer to the people. Each discussion of a single digit offer was met with a swift rejection.

5. In response to my repeated push for single digits, DDA Tran made it clear that they would only consider a double digit number with a minimum of 15 and closer to 20.

6. I advised Ms. Nguyen that the only chance to settle the case would be if she authorized me to offer double digits of 15 or more.  I was advised to only offer what Ms. Nguyen would accept.

7. Ms. Nguyen made it clear she would only authorize me to make a single digit offer of 5 years.  I explained to her again that the single digit offers had been rejected. I advised her to consider making a 15 year offer as it was double digits and noticeably higher than 5 years but not quite 20 as the people suggested.  She was absolutely set against an offer of the magnitude.  Although below DDA Tran's suggested range, I suggested Ms. Nguyen offer at least 10 to 12 years and she wouldn't allow me to offer that either.

8. During ongoing discussions, we discussed the merits of her case, and although I could see an argument against attempted murder, since she insisted she acted in self-defense, she never intended to shoot at the victim, and did not intend to kill the victim but only meant to scare her, I advised her that she could potentially get more time for assault for each shot fired and the resulting enhancements, including 25 to life.

9. We discussed 25 to life based upon the infliction of great bodily injury [("GBI")] and she understandably debated whether the injury suffered was considered GBI.  The point in sharing this information of course was to advise her of the potential exposure she faced at trial.

10. Nonetheless, she would not authorize an offer over single digits.  I explained that I couldn't negotiate further at that point since she didn't authorize me and they weren't making any offers.

11. On the day of the preliminary hearing, DDA Brett Wasley appeared for DDA Tran and

offered 20 years.  This was the first time we had received an offer and it was consistent with their suggested range to us.

12. Ms. Nguyen asked for time to consider the offer.  The court agreed  to give her until after the lunch hour but once she understood that she wouldn't get a continuance to a new court date to consider the offer, she decided to reject it and proceed forward with the preliminary hearing.

13. Admittedly, she was given very little time to consider the offer.  However, it was in line with what DDA Tran had been suggesting all along.

14. Throughout these discussions with Ms. Nguyen, I made clear to her what her sentencing exposure was both as to the charges she faced leading up to the preliminary hearing and the consequences she faced if she were to proceed through preliminary hearing.  I advised Ms. Nguyen that she faced a maximum of 29 years in state prison and a minimum of 25 years on the attempted murder charge and firearm enhancement (5-7-9 on the attempted murder charge and 20 years on the firearm enhancement), and that she potentially faced a life sentence after preliminary hearing if the District Attorney added attempted premeditated murder charges and GBI enhancements.

15. I never told Ms. Nguyen that she would likely receive 1 year for negligent discharge of a firearm.  I agreed that 5 years was a substantial offer, but they wanted 15 or more and she knew that.  I would never suggest one year would suffice on a shooting case in which the victim was hurt, albeit a flesh wound.

16. I advised Ms. Nguyen from early on that her biggest problem in the case were the charged firearm enhancements, even more so that the attempted murder charge, because that was where she was likely to rack up the most time.

Resp. Exh. H, Prosecutor's Resp, Exh. 17 at 1-3 (McElmurry Decl. ¶¶ 1-16).

Petitioner submitted a reply, accompanied by another declaration, in which she stated, in part, as follows:

I hired Nelson McElmurry to represent me after my arrest.  Mr. McElmurry was my attorney through the preliminary hearing.

Mr. McElmurry told me, shortly after my arrest, that I was probably looking at one year incarceration and that I would most likely be convicted of negligent discharge of a firearm. I had no idea what I could be facing in terms of incarceration or what charges I could be convicted of.  I relied on Mr. McElmurry for that information.

I am not a career criminal, so I had no other way of knowing what charges I could be facing or how much time I could be sentenced to.

The reason I had a single digit figure  in mind was because of what Mr. McElmurry had

36

told me at the beginning of my case. Mr. McElmurry never told me that I could be facing decades, let alone a life sentence, until the morning of the preliminary hearing.

On the morning of the preliminary hearing, Mr. McElmurry told me that the District Attorney had offered me a deal of 20 years. I was shocked, scared, confused, and had no idea what to do. When I expressed this to Mr. McElmurry, he told me that he wouldn't take the deal as it was almost like a life sentence. We only conferred for about five minutes. When I was told about the plea offer, that was the very first time I realized how serious my situation was. I told Mr. McElmurry that I needed more time to consider the offer. Five minutes was not enough time to make a life altering decision. Mr. McElmurry did ask the court for a day's continuance, but that was not granted.

When Mr. McElmurry and I were conferring for those few, brief moments, he mentioned that "life charges" could be added later. However, he did not explain to me what "life charges" meant. He did not tell me that a judge would not have discretion in sentencing. I thought a life charge **could** carry a life sentence, not that it **would** irrespective of the circumstances. Also, Mr. McElmurry **never** explained to me how the parole process, works for an inmate sentenced to a life term in California. He never told me I would have to appear before the Board of Parole Hearings in order to be considered for parole. He did not tell me what would be required of me in order for me to be granted parole. He never told me that a release would be guaranteed if I were to accept the plea whereas a release is not a foregone conclusion under the sentence I received. Had I known about the process for parole hearings alone, I would have accepted the plea offer.

Mr. McElmurry never told me how strong the prosecution's case was against me. He never indicated I could receive a life sentence based on the gun charge alone. He did not tell me I was likely to be convicted based on my own statement, i.e., that I fired a gun in the direction of people. That alone was sufficient for conviction irrespective of intent. Instead of an honest evaluation of the facts, Mr. McElmurry initially gave me an entirely inaccurate portrayal of the prosecution's case and never really corrected that portrayal.

Mr. McElmurry and I briefly spoke about the GBI allegation, but he never told me the gun enhancement alone could carry a term of 25 to life. He never explained all of the time I was facing were I to be convicted.

Had Mr. McElmurry told me how strong the prosecution's case was from the beginning, and told me exactly how much time I was facing, I would have accepted the plea offer with no hesitation.

Resp. Exh. I, Pet. Reply at Exh. 1 (emphasis in original and paragraph numbers omitted).

The state superior court denied her IAC claim as follows:

. . . Petitioner has claimed that she received ineffective assistance of counsel during the course of plea negotiations. More specifically, Petitioner has asserted that her attorney unrealistically led her to believe that a reasonable sentence in this case would be something in the "single digits" (i.e. no more than 9 years). This expectation, allegedly fostered and

maintained by counsel, led her to reject a plea bargain offer of 20 years.  Petitioner was sentenced after trial to a term of life with the possibility of parole for attempted murder, and a consecutive term of 20 years for the firearm enhancement.  Petitioner cogently and consistently asserts that she relied upon counsel's assessment of the case and he never explained her realistic sentencing exposure, the strength of the prosecution's case, or what a "life" sentence practically meant.

Counsel's declaration tells a different story, one of the client's unrealistic expectations and of his attempts to impress upon her the seriousness of her predicament. Counsel explains that he attempted to plea bargain as Petitioner desired but the People at all times wanted much more custodial time than Petitioner was willing to agree to.

While the declarations paint different pictures, from the record it is clear that counsel had a full, clear, and accurate understanding of the case.  As the People point out, from his statement on the record before the commencement of the preliminary hearing that he was aware "that a life charge will likely be coming post-prelim," it is evident that counsel himself understood the case's severity.   And when one considers the motion to reduce bail counsel filed on behalf of Petitioner there can be no doubt.  Counsel accurately set forth Petitioner's sentencing exposure, the facts of the case, and some possible defenses.  On this record there was no deficiency or incompetence in counsel's assessment of the case.  What remains is Petitioner's assertion that counsel deliberately misled her.  As she puts it: "what counsel said in court and what he told Petitioner are two very different things."  (Reply  at p. 10.)  But this claim raises two immediate questions: (1) Why? and (2) Where is the evidence supporting this?

As the People stress, the only evidence is Petitioner's "self-serving" declaration and this is insufficient alone.  (See *In re Alvarnaz* (1992) 2 Ca1. 4th 924, 938:  "a defendant's self-serving statement after [] conviction, and sentence [], is insufficient in and of itself to sustain the defendant's burden of proof [], and must be corroborated independently by objective evidence.  A contrary holding would lead to an unchecked flow of easily fabricated claims."  *People v. Barella* (1999) 20 Cal. 4th 261, 272, in which the court rejects as insufficient "defendant's bare assertion."  *People v. Gonzalez* (1990) 51 Cal.3d  1179, 1260, in which the court holds: "The state may properly require that a defendant obtain some concrete information on his own before he invokes collateral remedies against a final judgment."  *People v. Hunt* (1985) 174 Cal. App. 3d  95, 103, citing *People v. Brotherton* (1966) 239 Cal. App. 2d 195, 201, in which it is noted that, given his obvious bias, "the trial court is not bound by uncontradicted statements of the defendant.")

Besides the lack of supporting evidence there is a general implausibility to Petitioner's claim.  Petitioner has not suggested why an attorney would deliberately mislead and undermine their client.  "Because a petition for a writ of habeas corpus seeks to collaterally attack a presumptively final criminal judgment, the petitioner bears a heavy burden initially to plead sufficient grounds for relief, and then later to prove them."  (*In re Figueroa* (2018)  4 Cal. 5th 576, 587, quoting *People v. Duvall* (1995) 9 Ca1. 4th 464, 474.)  In the present case Petitioner has not satisfied the burden calling for a formal Order

38

1        to Show Cause.

2    Resp. Exh. J at 1-3.  As mentioned, petitioner raised her IAC claim again on collateral review in

3    the state appellate and supreme court, both of which denied the claim summarily.  *See* Resp. Exhs.

4    K & L.  As discussed above, this court should "look through" the California Supreme Court's

5    order to the last decision that provides a rationale—the state superior court's decision (*see* Resp.

6    Exh. J at 1-3)—and then presume that the California Supreme Court adopted the same reasoning.

7    *See Wilson*, 138 S. Ct. at 1192.

8        Under *Strickland v. Washington*, 466 U.S. 668, 686 (1984), the IAC claim must be

9    evaluated using two-prongs.  Under the first prong, "the defendant must show that counsel's

10   representation fell below an objective standard of reasonableness."  *Id.* at 688.  Petitioner has the

11   burden of "showing" that counsel's performance was deficient.  *Toomey v. Bunnell*, 898 F2d 741,

12   743 (9th Cir. 1990).  When assessing performance of defense counsel under this first prong, the

13   reviewing court must be "highly deferential" and must not second-guess defense counsel's trial

14   strategy.  *Strickland*, 466 U.S. at 689.  Thus, the relevant inquiry is not what defense counsel could

15   have done but rather whether the choices made by defense counsel were reasonable.  *See Babbit v.*

16   *Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998).  There is a "wide range of reasonable professional

17   conduct," and a "strong presumption" that counsel's conduct fell within that range.  *Strickland*,

18   466 U.S. at 689.  Conclusory allegations that counsel was ineffective do not warrant relief.  *Jones*

19   *v. Gomez*, 66 F.3d 199, 205 (9th Cir. 1995).

20       Under the second prong of the *Strickland* test, petitioner bears the highly demanding" and

21   "heavy burden" of establishing actual prejudice.  *Williams v. Taylor*, 529 U.S. 362, 394 (2000).

22   Petitioner has the burden of showing through "affirmative" proof that there was a "reasonable

23   probability that, but for counsel's unprofessional errors, the result . . . would have been different."

24   *Strickland*, 466 U.S. at 694.  A reasonable probability is defined under *Strickland* as "a probability

25   sufficient to undermine confidence in the outcome."  *Id.*  If the absence of prejudice is clear, a

26   court should dispose of the ineffectiveness claim without inquiring into the performance prong.

27   *Id.* at 692.

28                                                    39

United States District Court
Northern District of California

A "doubly deferential" judicial review is appropriate in analyzing IAC claims under section 2254. *Cullen v. Pinholster*, 563 U.S. 170, 202 (2011). The "question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

To prove ineffective assistance of counsel at the plea negotiations stage, the analysis under *Strickland* is based on "counsel's judgment and perspective when the plea was negotiated, offered and entered," not on a post-adjudication assessment of the case. *Premo v. Moore*, 562 U.S. 115, 126 (2011). To prove prejudice under the second prong of *Strickland* in the context of a rejected plea offer,

> a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Lafler v. Cooper*, 566 U.S. 156, 164 (2012).

Applying these principles, this court concludes that the state courts' rejection of petitioner's claim was not an unreasonable application of, or contrary to, clearly established Supreme Court precedent. Petitioner alleges that Attorney McElmurry engaged in deficient performance with respect to the plea offer, and that she satisfies that first *Strickland* prong because he: (1) "misrepresented [her] sentencing exposure"; and (2) "never explained exactly how much time [she] was facing, nor did he advise [her] as to the seriousness of the charges." Trav. at 25. Petitioner also submits that she also satisfies that second *Strickland* prong because "had counsel ever explained the sentencing exposure, [she] would have accepted the plea offer." *Id.* at 26. However, the court finds that petitioner's IAC claim fails on both *Strickland* prongs.

First, petitioner fails to show that Attorney McElmurry engaged in deficient performance with respect to the plea offer since she provides no evidence as to counsel's alleged deficiency or

incompetence in assessing the case.  Instead, petitioner claims in a conclusory fashion that Attorney McElmurry gave "incompetent and erroneous advice," stating as follows: "[B]ecause counsel completely misrepresented [her] sentencing exposure and even added he would not have taken the offer, petitioner was extremely confused and did not know what to do."  Trav. at 25-26.  However, contrary to petitioner's suggestion, based on the declarations submitted on the record, and as the state superior court reasonably noted, trial counsel Attorney McElmurry "had a full, clear, and accurate understanding of the case" against petitioner.  Resp. Exh. J at 2.  When petitioner retained Attorney McElmurry to represent her, the felony complaint on file dated October 29, 2012 reflected an exposure of twenty-nine years.  1CT 99-101.  Attorney McElmurry stated that he

> advised [petitioner] that she faced a maximum of 29 years in state prison and a minimum of 25 years on the attempted murder charge and firearm enhancement (5-7-9 on the attempted murder charge and 20 years on the firearm enhancement), and that she potentially faced a life sentence after preliminary hearing if the District Attorney added attempted premeditated murder charges and GBI enhancements.

Resp. Exh. H, Prosecutor's Resp, Exh. 17 at 3 (McElmurry Decl. ¶ 14).  The record supports counsel's aforementioned version of the events as stated in his sworn declaration.  Specifically, on December 20, 2012, after appearing in petitioner's case, Attorney McElmurry filed a motion to reduce petitioner's bail, which was denied on December 28, 2012.  1CT 108-116, 118.  In that motion, Attorney McElmurry stated that petitioner's charges "carr[ied] a maximum of 9 years with a 20 year enhancement for a total of 29 [years]."  1CT 109.  He also outlined the evidence against petitioner and her possible defenses, including that "the shooter was merely acting in self defense with warning shots."  1CT 109.  Furthermore, Attorney McElmurry's statements at the preliminary hearing on October 29, 2013 shows that he was aware of what potential charges might be in store for petitioner if she continued past the preliminary hearing, as he stated that "a life charge will likely be coming post-prelim."  1CT 4.  The record confirms that it was not until after the preliminary hearing, on November 7, 2013 when the Information was filed and additional charges were added, increasing petitioner's exposure to life in prison.  1CT 94-97.  (Almost two

41

weeks later, on November 20, 2013, petitioner was no longer represented by Attorney McElmurry and was again appointed counsel from the Public Defender's Office.  1CT 161.)

Second, the court finds unavailing petitioner's assertions that Attorney McElmurry never advised her about the "seriousness of the charges," Trav. at 25, and that he affirmatively advised her that she "would probably get a year or so for negligent discharge of a firearm," Resp. Exh. G (State Superior Court Pet., Exh. H at 1).  The record confirms that based on the felony complaint filed on October 29, 2012, petitioner was not charged with negligent discharge of a firearm, and instead she was charged with attempted murder with a maximum twenty-nine-year exposure.  *See* 1CT 98-100.  Based on this record, petitioner fails to explain how she purportedly believed she faced only a year of exposure when, as she acknowledged in her declaration, Attorney McElmurry had told her "a couple of months down the line" that "D.A. was not budging and . . . wanted [her] to do that max."  Resp. Exh. G (State Superior Court Pet., Exh. H at 1).  Additionally, petitioner fails to acknowledge that she was represented by the Public Defender's Office for about a month and a half before she retained Attorney McElmurry, who made his first court appearance on December 10, 2012.  1CT 102-106.  Nor does she make any allegations about whether her public defender informed petitioner of her sentence exposure and charges.

Meanwhile, the state superior court reasonably found "insufficient" petitioner's "self-serving" declaration because it was the "only evidence" of her assertion that "counsel deliberately misled her."  Resp. Exh. J at 2.  Thus, it was also reasonable that the state superior court found credible Attorney McElmurry's assertions that he "never told [petitioner] that she would likely receive 1 year for negligent discharge of a firearm" and "would never suggest one year would suffice on a shooting case in which the victim was hurt."  Resp. Exh. H, Prosecutor's Resp, Exh. 17 at 3 (McElmurry Decl. ¶ 15).  As such, the state superior court reasonably rejected this claim upon concluding that "there [was] a general implausibility to petitioner's claim" as she "has not suggested why an attorney would deliberately mislead and undermine their client."  Resp. Exh. J at 3.  Considering the "strong presumption that counsel's conduct falls within the wide range of

42

reasonable professional assistance," *Strickland*, 466 U.S. at 688, and that petitioner bears the burden of overcoming that presumption, the state superior court was reasonable to conclude that petitioner's assertions were not credible on this record, *see* Resp. Exh. J at 2-3.

Finally, as to the second prong, petitioner fails to show that, but for the deficient advice of counsel, there is a reasonable probability that she would have accepted the plea, the prosecution would not have withdrawn it in light of intervening circumstances, and the trial court would have accepted its terms. *See Lafler*, 566 U.S. at 164.  The record shows that petitioner rejected the 20-year plea offer that she was offered at the preliminary hearing.  But petitioner contends that she "would have taken the offer but since [she] was not fully advised correctly [she] denied the offer that day."  Resp. Exh. G (State Superior Court Pet., Exh. H at 1).  This contention is not supported by the record, however.  The offer was apparently presented to Attorney McElmurry the morning of the preliminary hearing, and the record confirms that it was communicated to petitioner that same morning.  1CT 3.  Attorney McElmurry stated in court during the preliminary hearing and in his declaration that "it was [their] understanding that there would be no offers made or forthcoming," and petitioner has not alleged otherwise.  1CT 3; Resp. Exh. H, Prosecutor's Resp, Exh. 17 at 1 (McElmurry Decl. ¶ 3).  Petitioner asked Attorney McElmurry for a continuance for petitioner "to assess and decide whether or not that 20-year offer [was] in her best interest," which Attorney McElmurry posed to the court.  1CT 3-4.  That continuance request was denied, and petitioner never challenged that denial. 1CT 4-5.  Petitioner asserted in a conclusory fashion that "had the court gave [her] a continuance and [Attorney McElmurry] took the time to explain to [her] about how much time each charge carries," she would have taken the offer.  Resp. Exh. G (State Superior Court Pet., Exh. H at 1).  In her traverse, petitioner argues that "no record was made as to petitioner's rejection of the offer, [and] the preliminary hearing merely commenced."  Trav. at 30.  However, the record reflects otherwise because immediately after the trial court denied the continuance, the following back and forth took place before the preliminary hearing commenced:

1         MR. MCELMURRY: Your Honor.  In that case, we'll proceed this morning.

2         THE COURT:      Okay.

3         MR. MCELMURRY: We will be unable to contact the family members through the

4                holding cell.

5         THE COURT:      Go ahead and call your first witness.

6  1CT 5.  Petitioner was present in court during this discussion, and yet she did not disagree with

7  counsel's statement that the defense had chosen to proceed with the preliminary hearing and, in

8  essence, rejected the plea offer.  1CT 5.  As mentioned above, it was reasonable that the state

9  superior court dismissed any suggestion that Attorney McElmurry would "deliberately mislead

10  and undermine their client" and instead found credible counsel's version that "once [petitioner]

11  understood that she wouldn't get a continuance to a new court date to consider the offer, she

12  decided to reject it and proceed forward with the preliminary hearing."  Resp. Exh. H,

13  Prosecutor's Resp, Exh. 17 at 3 (McElmurry Decl. ¶ 12).  The record also supports Attorney

14  McElmurry's statements that petitioner "insisted she acted in self-defense" and "made it clear she

15  would only authorize [him] to make a single digit offer" even after he explained that such offers

16  had been rejected and "advised her of the potential exposure she faced at trial."  Resp. Exh. H,

17  Prosecutor's Resp, Exh. 17 at 2 (McElmurry Decl. ¶¶ 6-10).  Thus, it is consistent that during the

18  preliminary hearing, even when she was told about potential new charges exposing her to life in

19  prison, she still rejected the twenty-year offer.  1CT 5.  Also consistent is petitioner's persistent

20  lack of desire to settle even on the first day of her trial on May 13, 2014—long after Attorney

21  McElmurry's representation had ended—as seen by the trial court's comments as follows:

22

23         THE COURT:      Calling People versus My Loan Nguyen, C1243737.  We had

24                engaged in very brief possible settlement discussions.  However, at
              this stage, my understanding is that the two parties are too far apart

25                and that neither side are willing to engage in further settlement
              discussion.  Is that correct?

26         [PROSECUTOR] MR. SHIPP:      Yes, Your Honor, that's correct.

27         [DEFENSE COUNSEL] MS. WALLMAN: Yes, Your Honor.

28                          44

United States District Court
Northern District of California

3RT 301.  Said differently, even up to the time of trial, petitioner's actions showing an unwillingness to settle were consistent with Attorney McElmurry's declaration relating to her decision to reject the twenty-year plea offer.  *See* Resp. Exh. H, Prosecutor's Resp, Exh. 17 at 3 (McElmurry Decl. ¶ 12).

Accordingly, this court finds reasonable the state courts' rejection of petitioner's claim that she received ineffective assistance of counsel during the course of plea negotiations.  Therefore, petitioner is not entitled to federal habeas relief on his IAC claim.

**C.    Certificate of Appealability**

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in the ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009).

To obtain a COA, petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Section 2253(c)(3) requires a court granting a COA to indicate which issues satisfy the COA standard.  Here, the court finds that two claims presented by petitioner in her petition meet the above standard and accordingly **GRANTS** the COA as to the claims listed below and **DENIES** the COA as to the remaining claims.  *See generally Miller-El*, 537 U.S. at 322.

The claims are:

(1) whether petitioner's statements to police were introduced in evidence in violation of *Miranda*; and

(2)  whether she received ineffective assistance of counsel during the course of plea negotiations.

45

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

**CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.

A certificate of appealability is **GRANTED** as to petitioner's *Miranda* violation and IAC claims, and it is **DENIED** as to the remaining claims.  Accordingly, the Clerk of the Court shall forward the file, including a copy of this order, to the Court of Appeals.  *See* Fed. R. App. P. 22(b); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).  Petitioner is cautioned that the court's ruling on the certificate of appealability does not relieve her of the obligation to file a timely notice of appeal if she wishes to appeal.

Michael Pallares has been substituted as respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

The clerk shall terminate all pending motions and close the file.

IT IS SO ORDERED.

Dated: February __2___, 2021.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

46